IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>    Plaintiff,<br><br>v.<br><br>CHARLES BURNS,<br><br>    Defendant. | No. 16-cr-132 (CRB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT OF ACQUITTAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 29** |

On April 6, 2017, twelve jurors hit for the cycle. They acquitted Defendant Charles Burns of possessing a firearm after previously being convicted of a felony (Count 1),[1] convicted him of possessing a firearm in a school zone (Count 3),[2] and hung on a charge of unlicensed dealing in firearms (Count 2).[3] Burns timely moved for a judgment of acquittal on the latter two counts.[4]

---

[1] 18 U.S.C. § 922(g)(1) provides: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting commerce, any firearm or ammunition . . . ."

[2] 18 U.S.C. § 922(q)(2)(A) provides: "It shall be unlawful for any individual to knowingly possess a firearm that has moved in or that otherwise affects . . . commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone."

[3] 18 U.S.C. § 922(a)(1)(A) provides in relevant part: "It shall be unlawful . . . for any person . . . except a . . . licensed dealer, to engage in the business of . . . dealing in firearms . . . ."

[4] Burns actually filed two motions, captioning the first as a motion for a "Directed Verdict" on Count 3 or, in the alternative, a motion to dismiss that count, see MDV (dkt. 142), and the second as a motion for a "Judgment of Acquittal Under Rule 29" on Counts 2 and 3, see R29 Mot. (dkt. 143). Those appear to amount to the same thing. See Fed. R. Crim. P. 29 advisory committee's note to 1944 amendment ("The purpose of changing the name of a motion for a directed verdict to a motion for judgment of acquittal is to . . . ."). The Court therefore treats these filings as two parts of one Rule 29 motion. To make clear which citations refer to which filing, it retains Burns's nomenclature.

## I. BACKGROUND

Trouble for Defendant Charles Burns started in March 2015, when he befriended a man in the Bayview neighborhood of San Francisco.[5] Trial Tr. at 212–13. That man turned out to be a confidential informant ("the CI") working undercover for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Id. at 211–12.

Shortly after they met, the CI told Burns that he wanted to buy a gun. Id. at 213, 279. Burns responded that he would try to find one, ultimately offering a .22 caliber Ruger for $450. Id. at 231, 221–22, 279–80. On March 23, 2015, the CI called Burns and asked about picking up the gun.[6] Ex. 4; Trial Tr. at 221. Burns responded that he was "trying to go get it right now," Ex. 4; Trial Tr. at 221–22, but because ATF could not get a support team together in time, the sale fell through, id. at 223–24, 316. When the CI tried again the next day, Burns said that his partner had gotten rid of the gun and offered to "find something else." Ex. 8.

Just over a week later, "something else" came in the form of a 9mm handgun. Trial Tr. at 230. Burns told the CI that he was going to "get that in about like an hour," but once again things were moving too quickly for ATF. Ex. 11; Trial Tr. at 232. The CI tried to push off the sale until the following Monday, though Burns warned him that the gun might be "gone" by then. Ex. 11. Even though the CI tried again on April 9, and even though Burns said that he would "probably have it" soon, the sale fell through. Ex. 12.

The third firearm—a Sig Sauer .45 caliber semiautomatic handgun—was the charm. Trial Tr. at 233–34. On April 21, the CI asked Burns if he could buy the gun at a McDonald's. Ex. 14. Burns told him instead to go to Third Street "by the gym." Trial Tr. at 234–35. This time ATF was ready. After being outfitted with a hidden camera, the CI drove to the point of sale with another confidential informant. Id. at 239. When they pulled up,

---

[5] As it must, the Court construes the trial record in the light most favorable to the government. See Jackson v. Virginia, 443 U.S. 307, 319–20 (1979); United States v. Nevils, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

[6] The CI often communicated with Burns by phone and text messages, some of which were recorded and preserved, many of which were not. The Court instructed the jury accordingly. See Jury Instr. (dkt. 120) ("Reasonable Doubt—Further Instruction").

2

Burns was crossing Oakdale Avenue—apparently walking away from a trash can, which itself was down the street from Burns's car. Ex. 3 (video). The CI got out, walked over to Burns, and shook his hand. Id. A man in a gray beanie (affectionately known at trial as "Beanie Guy") then approached the CI and said, "Gimme the money, bruh." Id. After the CI handed over $800, Beanie Guy counted the money and pointed to the trash can, which was feet away from a sign reading: "DRUG FREE SCHOOL ZONE." Ex. 3; Ex. 22a.

The CI ran over to the trash can and found a plastic bag containing a receipt from a shoe store—and the Sig Sauer handgun. Ex. 1; Ex. 3; Trial Tr. at 242–43. He then put the gun in his car and returned across the street to thank Burns, saying, "Yeah I like that." Ex. 3. Burns shook his hand and said he should have charged "extra" for holding onto the gun. Id. The CI asked how much, and Burns told him "twenty-five." Id.

The trash can, it turns out, was within 1000 feet of Leola Havard Early Education School. Ex. 19; Ex. 306; Trial Tr. at 151, 452–54. Leola Havard offers preschool classes and transitional kindergarten ("T-K"), but not regular kindergarten or other higher grades. Trial Tr. at 164, 432; accord MDV at 12–13. It also offers an after-school program to older students, a piece of which is "academic support." Trial Tr. at 439–40.

At trial, the Court decided that whether Leola Havard qualified as a "school" under § 922(q)(2)(A) was a question of law but deferred ruling on the matter. Accordingly, the Court instructed the jury that, during their deliberations on Count 3, they "should assume that Leola Havard Early Education School qualifies as a 'school' under the law." Jury Instructions ("Count 3: Firearms—Unlawful Possession—School Zone"). Also relevant here, the Court gave an aiding and abetting instruction as to Count 3, but Count 3 only. Id. ("Aiding and Abetting (Count 3)"). As to Count 2, it instructed the jury that Burns must be "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms" to be convicted. Id. ("Count 2: Firearms—Dealing Without a License"); see also 18 U.S.C. § 922(a)(21)(C).

## II. LEGAL STANDARD

When a defendant moves under Federal Rule of Criminal Procedure 29, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319–20 (1979); United States v. Nevils, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). In doing so, the Court may consider neither how it would have viewed conflicting evidence, nor whether it itself believes that guilt was established beyond a reasonable doubt. Id.

## III. DISCUSSION

Burns challenges his conviction on Count 3 for possession of a firearm in a school zone on essentially two fronts. First, he argues that Leola Havard, though a school in the colloquial sense, does not qualify as a "school" in the legal sense. See MDV at 12–32. Second, he argues that, even if it does qualify, the evidence at trial was insufficient to support a conviction. See R29 Mot. at 9–15.

Burns further urges the Court to halt any impending retrial on Count 2 for want of sufficient evidence that he was engaged in the business of firearms dealing. See id. at 3–9.

### A. Count 3: Meaning of "School"

Burns's first challenge to his conviction on Count 3 has two prongs. He argues that (1) it was for the jury, not the Court, to decide whether Leola Havard is a "school" under the law, and (2) whomever the proper decider, the proper decision is that this school is no "school" after all. See MDV at 1–2 & n.1.

#### 1. The Proper Decider

Under the federal firearms laws, the term "school" means "a school which provides elementary or secondary education, as determined under State law." 18 U.S.C. § 921(a)(26). Although both parties at times urged the Court to determine the state-law definition of "elementary education" and give it to the jury, see Trial Tr. at 20 (government); MDV Reply

4

(dkt. 156) at 5 (Burns), the Court holds that whether Leola Havard meets those criteria is indeed a question of law.

Consider the Indian Major Crimes Act, which provides for federal criminal jurisdiction over any "Indian" who commits certain crimes on tribal land. 18 U.S.C. § 1153(a). Under that statute, the government must prove the defendant's "membership or affiliation in any federally acknowledged Indian tribe" beyond a reasonable doubt. United States v. Zepeda, 792 F.3d 1103, 1110 (9th Cir. 2015) (en banc) (citations omitted). But, as the Ninth Circuit held in United States v. Zepeda, 792 F.3d 1103 (9th Cir. 2015) (en banc), "federal recognition of a tribe" remains a question of law to be decided based on a list published by the Bureau of Indian Affairs ("BIA"), as well as any "other evidence that is judicially noticeable or otherwise appropriate for consideration." Id. at 1114. So in Zepeda it was for the court to decide whether a particular tribe—there the Gila River Indian Community—was federally recognized, while it was for the jury to decide whether the defendant had a sufficient link to that tribe. Id.

So too here. It is for the Court to determine whether a particular school—here Leola Havard—is federally recognized, while it was for the jury to decide whether Burns's possession of a firearm had a sufficient link to that school. And just as the BIA's list provided an "authoritative" reference point in Zepeda, California law provides an authoritative reference point here.[7] That the latter might not give as readily available an answer makes the Court's task harder, but it does not take that task away.[8]

Burns counters that the federal criminal code is littered with statutory definitions that pose questions of fact and provides some examples. See MDV Reply at 4; see also, e.g., United States v. Overton, 573 F.3d 679, 688 (9th Cir. 2009) (observing that, under 18 U.S.C. § 2256(2)(A), the jury determines whether images depict "sexually explicit conduct"). True

---

[7] Even if "recognition" of an Indian tribe (or, for example, a foreign state) is something of a term of art, the analogy to Zepeda holds.

[8] This difficulty reinforces the wisdom of deferring decision on the school question until after trial. Doing so enabled the parties to submit more considered briefing on the issue and allowed for the chance that it would have been mooted by an acquittal on Count 3.

5

enough. But Burns could just as easily have pointed out that this very statute required the jury to determine whether he "possessed" a firearm. Neither observation advances the ball.

### 2. The Proper Decision

For Leola Havard to qualify as a "school" in the legal sense, it must both (i) be a "school" in the colloquial sense and (ii) "provide[] elementary or secondary education, as determined under State law." 18 U.S.C. § 921(a)(26). No one doubts that Leola Havard, as "an institution for the teaching of children," Merriam-Webster's Collegiate Dictionary (10th ed. 1996), meets the former criterion. Instead, the parties spill much of their ink debating whether Leola Havard "provides elementary or secondary education" within the meaning of California law. Because the highest grade taught at Leola Havard during the school day is T-K, that can only be so if teaching T-K or offering after-school academic support to older students qualifies as providing elementary education.

California law defines T-K as "the first year of a two-year kindergarten program that uses a modified kindergarten curriculum that is age and developmentally appropriate." Cal. Educ. Code § 48000(d). T-K's curriculum is therefore "aligned to the California Preschool Learning Foundations." Id. § 48000(f). Both T-K and kindergarten are established in Title II of the California Education Code—helpfully entitled "Elementary and Secondary Education." See id. §§ 48000(a)–(g). Preschool, on the other hand, is established in Title I—not Title II. See id. §§ 8235–39. It follows that T-K and kindergarten "provide[] elementary . . . education, as determined under State law," 18 U.S.C. § 922(q)(2)(A), while preschool does not.[9] See La Rue v. Bd. of Trustees of Baldwin Park Sch. Dist., 40 Cal. App. 2d 287, 293–94 (Ct. App. 1940) (holding that kindergarten qualified as part of the elementary school system based on its location in the School Code, the statutory predecessor of the Education Code).

Neither the rule of lenity nor the void-for-vagueness doctrine counsels otherwise. The rule of lenity requires the Court to construe an ambiguous statute in favor of a criminal

---

[9] There is thus no need to delve further into the minutiae of how T-K operates, or to consider whether the after-school program provides elementary education within the meaning of the statute.

defendant only if, "after seizing everything from which aid can be derived," it can offer "no more than a guess" as to the statute's meaning. Reno v. Koray, 515 U.S. 50, 65 (1995) (internal quotation marks omitted). The mere "existence of some statutory ambiguity" is not enough because "most statutes are ambiguous to some degree." Muscarello v. United States, 524 U.S. 125, 138 (1998); see also Lockhart v. United States, 136 S. Ct. 958, 969 (2016). This case falls in the latter bucket.

Burns's void-for-vagueness argument falls equally flat. For a start, that a criminal law poses a question of statutory interpretation—even a tricky one—does not automatically render it void for vagueness. See, e.g., Muscarello, 524 U.S. at 139 (construing statute against criminal defendant without concern for vagueness principles); Lockhart, 136 S. Ct. at 961–62 (same). More fundamentally, the void-for-vagueness doctrine rests on due process concerns about inadequate notice and arbitrary enforcement. See United States v. Jae Gab Kim, 449 F.3d 933, 941–42 (9th Cir. 2006). But here the statute requires that the defendant knowingly possess a gun in a place he knew or should have known was a school zone, see 18 U.S.C. § 922(q)(2)(A), and puts the definition of "school" in the hands of state law, not law enforcement, id. § 921(a)(26). Both facts are fatal to Burns's vagueness challenge.[10] See Jae Gab Kim, 449 F.3d at 943–44; see also United States v. Nieves-Castano, 480 F.3d 597, 603 (1st Cir. 2007) (holding that the scienter requirement in this very statute "ameliorates any vagueness concerns").

### B. Count 3: Sufficiency of the Evidence

Even though Leola Havard legally qualifies as a "school," Burns maintains that there was nevertheless insufficient evidence for a reasonable jury to convict beyond a reasonable doubt on Count 3. As an initial matter, Burns maintains that, by acquitting him on Count 1, the jury "necessarily and unanimously concluded" that he did not personally possess a firearm. R29 Mot. at 3 n.2. However tempting that inference under the circumstances, Burns

---

[10] Burns is correct that whether he had reasonable cause to believe that he was in a school zone does not go to whether Leola Havard legally qualifies as a "school," MDV Reply at 17. But the statute's mens rea requirement still mitigates any concern that his conviction for possessing a gun near Leola Havard came as an unconstitutional surprise.

7

is mistaken under the law.[11] The jury might have convicted on Count 3 under an aiding-and-abetting theory, but it "is equally possible that the jury, convinced of guilt, properly reached" the conclusion that he himself possessed a firearm, "and then through mistake, compromise, or lenity, arrived at [the] inconsistent conclusion" of acquitting on Count 1 but convicting on Count 3. United States v. Powell, 469 U.S. 57, 65 (1984). The Court therefore considers the evidence on Count 3 "independent of the jury's determination that [the] evidence" on Count 1 was insufficient. United States v. Hart, 963 F.2d 1278, 1282 (9th Cir. 1992).

With that understanding, the government's case on Count 3 has three possible holes: (1) insufficient evidence that Burns himself "possessed" the Sig Sauer handgun, (2) insufficient evidence that he, Beanie Guy, or any other possible principal knew or had "reasonable cause to believe" that the transaction took place in a school zone, and (3) insufficient evidence that certain statutory exceptions did not apply to Beanie Guy or any other possible principal.

### 1. Possession

A person has possession of something if he "knows of its presence" and has either "physical control" of the object or the "power and intention to control" it. Ninth Circuit Model Jury Instr. (Criminal) no. 3.17.; see also United States v. Cain, 130 F.3d 381, 382 (9th Cir. 1997). A person can therefore possess something either directly or through another person, United States v. Terry, 911 F.2d 272, 279 (9th Cir. 1990), while multiple people can possess something simultaneously, United States v. Chambers, 918 F.2d 1455, 1457–58 (9th Cir. 1990). There can be no doubt that Burns knew of the gun's presence, and he does not contend otherwise, see R29 Reply at 12–13. So here the dispute centers around whether there was sufficient evidence to prove that Burns had "physical control" of a gun or, at the very least, the "power and intention" to control one.

The most the government had going to physical control was that, when the CI arrived, Burns was crossing Oakdale Avenue—away from the trash can, which itself was just down the street from his car. He also told the CI he had been "holding" the gun. See R29 Opp'n at

---

[11] Tellingly, he appears to abandon this position on reply. See R29 Reply at 11.

9–10. It's plausible that Burns got out of his car, walked past the trash can, stashed the Sig Sauer handgun, and crossed the street, with his path forming a crisp "L" shape. It's less plausible that he meant "holding" in the physical sense rather than the Nordstrom sense, i.e. making sure that no one else buys a particular piece of merchandise. Regardless, guilt beyond a reasonable doubt, not plausibility, is the bar. So, without more, there was insufficient evidence to prove that Burns had "physical control" of a firearm.[12]

No matter. There was sufficient evidence to prove that Burns had the "power and intention to control" one. He arranged the sale, admitted to keeping the gun available for the CI, and was on-scene for the transaction—all of which suggest that he had the power and intention to control the gun. In fact, those actions are "the very hallmark of possession," Henderson v. United States, 135 S. Ct. 1780, 1785 n.3 (2015) (noting that a defendant's "management of the sale," especially when on-scene, demonstrates "his broader command over the guns' location and use"). A reasonable jury could therefore conclude beyond a reasonable doubt that Burns possessed the gun, at least jointly.[13]

### 2. Reasonable Notice

Burns also maintains that there was insufficient evidence to prove that he or anyone else knew or had "reasonable cause to believe" that the transaction was taking place in a school-zone. Not so. And for one simple reason:

---

[12] The answer might have been different if the receipt found along with the gun had been for a pair of shoes in Burns's size. Alas, the record is silent.

[13] This case is a far cry from United States v. Barnett, 468 F.2d 1153 (9th Cir. 1972), which held that a "casual facilitator of a sale" cannot be said to constructively possess the merchandise, even jointly. Id. at 1154. There, unlike here, the defendant played a truly bit part in two illicit transactions. Id. During one, he acted as a translator, gave a buyer his phone number (but was never called), and expressed both approval of the plan as well as worry about its possible legal consequences. Id. During the other, he opened the door and laughed at a joke. Id.

9



Ex. 3 (screen shot). The sign reads: "DRUG FREE SCHOOL ZONE." See Ex. 22a; Trial Tr. at 342–344. If that does not provide people standing across the street with reasonable cause to believe that they are in a school zone, then a stop sign does not provide drivers approaching an intersection with reasonable cause to believe that they must stop.[14]

Burns nevertheless goes on to argue that, because the jury could not be certain anyone other than Burns could read,[15] it could not conclude beyond a reasonable doubt that Beanie Guy had reasonable cause to believe he was in a school zone. See R29 Mot. at 12. No. Absent evidence to the contrary, a jury may infer that an adult who is in the United States, speaks English, and knows how to count can read basic phrases. The government must prove its case beyond a reasonable doubt, not any shadow of a doubt.[16] United States v. Ruiz, 462 F.3d 1082, 1087 (9th Cir. 2006).

---

[14] There is, of course, more. The corner where Burns and Beanie Guy were standing was well within 1000 feet of Leola Havard. Although proximity is not enough on its own, Burns's own cases confirm that it is probative, especially alongside other evidence. See United States v. Haywood, 363 F.3d 200, 208–10 (3d Cir. 2004); United States v. Guzman-Montanez, 756 F.3d 1, 10–12 (1st Cir. 2014). And here the corner had a clear line of sight to the school, while Burns, for his part, lived nearby and often frequented the area.

[15] Burns's text-message conversations with the CI made that much clear.

[16] It also makes no difference whether anyone actually walked up to the sign and read it.

10

### 3. Statutory Exceptions

Burns's third sufficiency-of-the-evidence challenge on Count 3 fares little better than his second. He maintains that the government needed to "disprove" that certain statutory exemptions applied to Beanie Guy. See R29 Mot. at 13–14. This is wrong on several levels.

First, if ever there were a statute where exceptions are plainly not "incorporated into the enacting clause," United States v. Vuitch, 402 U.S. 62, 70 (1971), this is it. Subsection (A) of § 922(q)(2) provides that it "shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school"—full stop. 18 U.S.C. § 922(q)(2)(A). Subsection (B) then provides that the former provision "does not apply to the possession of a firearm" in a number of situations, such as on private, non-school property or when done by law enforcement in the course of their duties. Id. § 922(q)(2)(B).

Second, rather than "negate an element of the crime," Smith v. United States, 133 S. Ct. 714, 719 (2013), these exceptions make it lawful for someone to commit each and every one of its elements.[17] They are affirmative defenses. And because nothing indicates that Congress has chosen to upset the common-law rule that the defendant bears the burden of proving an affirmative defense, see id. at 720, Burns had the burden of proving that a statutory exception applied.

Third, if there were something "inherently unfair" about imposing the burden of proving an affirmative defense on the defendant when the defense belongs to an absent principal, there would be a case saying so. Burns has not offered one. That is probably because there is nothing inherently unfair about it. To convict under an aiding and abetting theory, the jury must find beyond a reasonable doubt that the defendant "aided, counseled, commanded, induced or procured" the principal "with respect to at least one element" of the charged offense. Ninth Circuit Model Jury Instr. (Crim) no. 5.1. By definition, then, an

---

[17] Police officers, for example, do not need to carry their service weapons accidentally to fall within the law enforcement exception.

11

aider and abettor must have some relationship with the principal. So even when the principal is absent, the "information asymmetry" still "heavily favors the defendant," Smith, 133 S. Ct. at 720 (noting that defendants claiming to have withdrawn from a conspiracy are best situated to bear the burden of proving a withdrawal defense).

And now, with thanks in part to the harrowing facts of Rosemond v. United States, 134 S. Ct. 1240 (2014), a helpful hypothetical: Two men are on trial for shooting a third with a single bullet. No one knows who pulled the trigger, and both men invoke their right against self-incrimination. The government, as is its prerogative, prosecutes the two men under two alternative theories: that each pulled the trigger, and that each aided and abetted the other. The jury convicts both men, but the verdict form is general. There is thus no way to know who the jury found was the principal and who it found was the aider and abettor. Must the convictions be overturned because the government did not disprove self-defense as to both men? No. And what if instead one man escapes, never to face trial, while the other is convicted as before. Different answer? Surely not.

### C. Count 2: Sufficiency of the Evidence

Count 2 required the jury to find, beyond a reasonable doubt, that Burns "engage[d] in the business" of "dealing in firearms" without a license. See 18 U.S.C. § 922(a)(1)(A). To win a conviction on this charge, it was at one time "enough to prove that the accused has guns on hand or is ready and able to procure them" for sale, so long as he or she had the "principal objective" of profit. United States v. Breier, 813 F.2d 212, 213–14 & n.1 (9th Cir. 1987). If that were still the bar, there might well be sufficient evidence here to meet it. Burns was ready and able to procure weapons on three occasions[18]—for a price. He also remarked that the CI should pay him "extra" for keeping the Sig Sauer handgun available.[19] And based on the division of labor and use of the trash can at the point of sale, the

---

[18] Recall that the first two transactions fell through not because Burns couldn't procure guns, but because ATF needed more time.

[19] Even though this $25 was never paid, a reasonable jury could conclude that the fact of the request erased any remaining doubt that Burns had a "principle objective" of profit. Furthermore, guns entered the picture a mere week or two after Burns met the CI.

12

transaction had the flavor of a semi-professional operation.[20]

But now the bar is higher. In 1986, Congress amended the statute, adding a definition for the term "engaged in the business." See Breier, 813 F.2d at 214. A defendant must now "devote[] time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit <u>through the repetitive purchase and resale of firearms</u>." 18 U.S.C. § 921(a)(21)(C) (emphasis added); see also Breier, 813 F.2d at 214–15 (rejecting defendant's argument that this new definition should be applied retroactively). Puzzlingly, the Ninth Circuit's model instruction does not contain the underscored language. See Ninth Circuit Model Jury Instr. (Criminal) no. 8.53. But mindful that it must "give effect, if possible, to every clause and word of a statute," Williams v. Taylor, 529 U.S. 362, 404 (2000), the Court concludes, as it did at trial, that the statute requires the government to prove that the defendant acted "through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C).[21] On this score, the evidence was indeed "nonexistent." Trial Tr. at 387.

Burns is not through the woods just yet. At trial, the Court rejected a belated government request to issue an aiding and abetting instruction on Count 2. See Gov't Trial Br. (dkt. 113) at 2–3. The Court did so not because such a theory was unworkable, but because the request came at the eleventh hour. But now trial is over and the jury hung. Burns therefore seeks to prevent an impending retrial on Count 2. And because any indictment should be read as implying an aiding and abetting theory into each count, see United States v. Vaandering, 50 F.3d 696, 702 (9th Cir. 1995), the Court would allow an aiding and abetting instruction with proper notice.

---

[20] Hiding the gun in a trash can was a dead giveaway that Burns's conduct was "willful," i.e. that he knew his conduct was unlawful.

[21] In arguing for a lower bar, the government relies on United States v. King, 735 F.3d 1098 (9th Cir. 2013), and United States v. Shan, 80 F. App'x 31 (9th Cir. 2003). Neither case controls. As to King, the government relies on a parenthetical quotation in a footnote that is plainly dicta. See R29 Opp'n (relying on King, 735 F.3d at 1107 n.8). As to Shan, the case is an unpublished decision and therefore has no precedential value. See Ninth Circuit Rule 36–3(a).

13

Under 18 U.S.C. § 2(a), a person who "aids, abets, counsels, commands, induces, or procures" the commission of a crime may be punished as a principal. A person will be liable, however, only if he "(1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Rosemond, 134 S. Ct. at 1245. The Supreme Court has also made clear that the "division of labor between two (or more) confederates" has "no significance." Id. at 1247. In other words, a "strategy of 'you take that element, I'll take this one'" absolves neither party of liability. Id. So in a kidnapping, for example, it makes no difference if one confederate lures the victim into a car, a second drives the car away, and a third holds the victim captive—even though no one "would have personally completed, or even assisted with, all elements of the offense." Id. at 1247 n.6.

Here too the Ninth Circuit's model instructions need updating. Despite the above admonition, they saddle the government with proving that the charged crime "was committed by someone," Ninth Circuit Model Instruction (Criminal) 5.1. That could (and perhaps must) be read as requiring the jury to find that a principal "personally completed . . . all elements of the offense," Rosemond, 134 S. Ct. at 1247 n.6. That is not the law. Id. at 1247 & n.6.

Nevertheless, Burns ultimately makes it through the woods. The government put forward evidence that he arranged three firearms sales, one of which went through. The shady circumstances of the completed sale suggest just that: a shady sale. But they are scant evidence that Beanie Guy (or any other possible principal) purchased and resold firearms, as required by § 921(a)(21)(C). The owner(s) of the three guns might have purchased the weapons, but they might also have gotten them as a gift or by some other means. The jury had no way to know. Even a proper, more expansive understanding of aiding and abetting does not patch this hole in the government's case.[22]

And now, this time with thanks to the very authority on which the government relies, some perspective: In United States v. King, 735 F.3d 1098 (9th Cir. 2013), the defendant

---

[22] At the motion hearing, the government represented that it would pursue an aiding and abetting theory not under the usual § 2(a), but instead under § 2(b). The latter makes it a crime for a person to "willfully cause[] an act to be done which if directly performed by him" would be criminal. 18 U.S.C. § 2(b). Putting aside whether that approach would have problems all its own, the hole remains.

14

1 "secured a one-room office" to house a "firearms business" supposedly headed by another person. Id. at 1101. He then "began purchasing firearms" surreptitiously, going so far as to pose as the ostensible business owner. Id. at 1102 (emphasis added). In United States v. Breier, 813 F.2d 212 (9th Cir. 1987), the defendant rented tables at gun shows, "where he engaged in the trading, selling and purchasing of firearms." Id. at 213 (emphasis added). And in United States v. Ibarra, 581 F. App'x 687 (9th Cir. 2014), the defendant "purchased over twenty firearms, took title of the weapons in his own name, and then delivered them to his cousin in exchange for $100 per weapon." Id. at 690 (emphasis added).[23]

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the motion for a judgment of acquittal as to Count 3 but GRANTS the motion as to Count 2.

**IT IS SO ORDERED.**

Dated: June 20, 2017

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[23] Even assuming that the sparse facts discussed in Shan map on to those here, see 80 F. App'x at 31, that unpublished case is not persuasive. Shan relied exclusively on Breier despite the changed statutory landscape that Breier itself acknowledged. See id. at 31. It is also an outlier. See, e.g., United States v. Tyson, 653 F.3d 192, 195, 200–02 (3d Cir. 2011) (holding that there was sufficient evidence to convict under § 922(a)(1)(A) where the defendant "began purchasing a significant quantity of firearms" in Tennessee and "transporting those weapons to the Virgin Islands for resale" (emphasis added); United States v. Nadirashvili, 655 F.3d 114, 118 (2d Cir. 2011) (holding the same and noting that the defendants took steps "to purchase" machine guns—a/k/a "cars . . . with automatic transmissions"—and exchanged cash to make that happen (emphasis added)).

15